IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:23-cr-00535 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| DANIEL KOVACIC, | ) | **DEFENDANT'S MOTION TO** |
| | ) | **SUPPRESS SEARCH OF WICKLIFFE** |
| Defendant. | ) | **RESIDENCE** |
| | ) | |
| | ) | **MOTION TO DISMISS** |
| | ) | |
| | ) | (*Franks Hearing and/or Oral Hearing* |
| | ) | *Requested*) |

Now comes Defendant Daniel Kovacic, by and through his undersigned counsel, Marisa L. Serrat, and respectfully moves this Honorable Court to suppress all evidence obtained as a result of the unlawful search of 1548 Ridgewick Dr. in Wickliffe, Ohio on August 17, 2023, as well as all, all evidence and statements obtained as fruits of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407 (1963). The defense further requests this Honorable Court to dismiss the Indictment against Kovacic due to the totality of the outrageous government conduct of law enforcement on August 17, 2023. These requests are more thoroughly explained in the attached Memorandum in Support, which is incorporated herein by reference. In addition, the defendant requests an oral hearing and/or a *Franks* hearing to present additional evidence, testimony, and arguments in support of his Motion before this Honorable Court.

Respectfully Submitted,

s/ Marisa L. Serrat
**Marisa L. Serrat (#0088840)**
Attorney for the Defendant

<u>**MEMORANDUM IN SUPPORT**</u>

**I.     PROCEDURAL HISTORY.**

On September 20, 2023, Daniel Kovacic was named in a 1-Count Indictment in the Northern District of Ohio. The Indictment alleges that on August 17, 2023, Mr. Kovacic possessed a firearm and ammunition in violation of 18 U.S.C. §922(g)(1) and §924 (a)(8). (Indictment, R. 1, PID 1-2). Mr. Kovacic was taken into federal custody on September 27, 2023 and has remained detained since that date. (Arrest Warrant, R. 12, PID 43).

**II.     SUMMARY OF THE INCIDENT.**

On Thursday, August 17, 2023 from approximately 4:05 to 4:10 PM various 911 calls were placed in the City of Wickliffe, Ohio. As a result, Wickliffe police responded to the 1500 block of Ridgewick in Wickliffe, Ohio. By approximately 4:15 PM, Wickliffe Police formed a perimeter around 1548 Ridgewick. Upon arriving in the area, law enforcement Officers never approached the residence at 1548 Ridgewick. In fact, not one Officer or law enforcement personnel knocked on the door or approached the residence that day.

At approximately 5:05 PM, a female was observed leaving the residence at 1548 Ridgewick. She was ordered to the ground by police, detained, and taken into custody. The female, later identified as Kelly Seibert, was leaving for a scheduled appointment, completely unaware that police had been outside of the residence for approximately one (1) hour at that point. Seibert confirmed she was inside of 1548 Ridgewick with Daniel Kovacic and arrived there at approximately 4:00 p.m., which was confirmed by law enforcement by phone records. Seibert informed the police numerous times that Mr. Kovacic was asleep inside of the residence and they were unaware of any police presence outside. When she left the residence, Ms. Seibert left a note that was later recovered by police stating, "Dan – I'm coming back after my class. Ends @ 8:00. I

have other phone. I'll call you as soon as I'm out! <3 Kel I fed Paisley @ 500 too." (Note from Siebert, Def. Ex. B). The note that was recovered from the residence corroborates Ms. Siebert's statements to police on August 17, 2023.

Kelly Seibert also informed police that she did not hear any gunfire and did not see Daniel Kovacic with a firearm on August 17, 2023. Ms. Seibert also told law enforcement that she had never previously seen Daniel Kovacic with a firearm. Siebert was detained immediately upon exiting the residence and was not permitted to speak to anyone other than law enforcement while she was detained for hours. Law enforcement Officers who spoke to Seibert and knew that she had reported Daniel Kovacic was inside sleeping and did not relay this information to ERT, CNT, Kovacic's family, or the media. Instead, these Officers continued to spread the false "barricade" and "standoff" narrative, despite having spoken to Seibert and observing her walk out the residence unaware of police presence and unimpeded by any barricade.

Having heard this direct information that Daniel Kovacic was inside the residence sleeping, law enforcement still never once approached the residence. Officers never knocked on the door. Instead, one Officer made phone calls and text messages to a phone number associated with Mr. Kovacic for approximately two and a half hours, all which all went unanswered because he was sleeping and his phone was silenced. (Officer Ross Communication, Def. Ex. C). The only movement allegedly seen inside of the residence during that time was attributed to a dog. There was no physical or visible evidence of a "standoff" between Daniel Kovacic and police on August 17, 2023.

The Western Lake County Emergency Response Team ("ERT"), including Willoughby Police Officers, also responded to the scene. The totality of the circumstances clearly established

that Daniel Kovacic was never "barricaded" or in a "standoff" with police on August 17, 2023. However, the Officers used this false narrative throughout their interactions that evening.

After many hours passed, law enforcement had still not approached the residence of 1548 Ridgewick. At approximately 21:02 aka 9:02 p.m., shortly after law enforcement approached 1548 for the first time, Daniel Kovacic was alerted for the first time that police were outside of the residence and voluntarily exited the residence. He was taken into police custody without incident. After Daniel Kovacic was taken into police custody, Officers obtained a search warrant for the residence, which is challenged herein. (Search Warrant, Def. Ex. A).

## III.    THE SEARCH WARRANT AFFIDAVIT CONTAINED FALSE INFORMATION AND LACKED PROBABLE CAUSE TO SEARCH THE RESIDENCE.

Detective James Coolick's assistance was requested to assist that day at the same time Wickliffe Police Department requested ERT and CNT to assist with a "barricaded male" at approximately 4:45 PM. It was not until Detective Coolick obtained an arrest warrant for Kovacic, that Officers at Ridgewick then finally alerted Kovacic to their presence outside.

Later that evening, Detective James Coolick was the Affiant to a search warrant that was presented to Willoughby Municipal Court Judge Marisa Cornachio on August 17, 2023. (Search Warrant Affidavit, Def. Ex. A). The Affidavit begins with the Affiant's background as a law enforcement officer for the City of Wickliffe, Ohio. The defense raises numerous factual and legal disputes regarding the following paragraphs of the page and a half Affidavit submitted by Detective Coolick in support of the search of the residence, 1548 Ridgewick Wickliffe, Ohio on August 17, 2023.

Only one individual ever claimed to see anyone shooting a gun on August 17, 2023. This person told the Affiant he was not familiar with who this person was and did not tell the Affiant that this person was the resident of 1548 Ridgewick or Daniel Kovacic. Only one individual, Kelly

4

Seibert, ever confirmed to law enforcement that they saw Daniel Kovacic (or a resident of 1548 Ridgewick) prior to him voluntarily exiting the residence at 1548 Ridgewick at approximately 9:00 pm. Ms. Siebert continuously told the Officers that Daniel was working, eating, and sleeping inside of the residence. She repeatedly told the Officers that she had not seen Daniel Kovacic with a gun that day and did not see Daniel Kovacic shoot a gun that day. The specific factual and legal challenges to each paragraph of the Affidavit are addressed below.

1. **On August, 17th 2023 numerous emergency calls were received by the Wickliffe Police Department reporting gunshots being fired in the area of the 1500 block of Ridgewick Dr.**

The Affidavit implies that on scene investigation of police was how law enforcement determined Daniel Kovacic allegedly shot a firearm on August 17, 2023. When in fact, the 911 calls alone were what Wickliffe Police and the Affiant used to conclude that a resident of 1548 Ridgewick shot a gun, who they somehow immediately determined to be Daniel Kovacic through a residence check. At 4:13 PM, Wickliffe Police concluded that Daniel Kovacic allegedly shot a firearm using 911 caller reports alone, without speaking to any witnesses. Not a single 911 caller claimed that they saw Daniel Kovacic, a resident of 1548 Ridgewick, or any other specific named individual shooting a gun that day.[1]

According to Detective Coolick's written report, once he arrived at Wickliffe Police Department and prior to him arriving on scene, he spoke with Dispatcher Stein and learned of numerous emergency phone calls of gunshots being heard in the area of the Ridgewick Condominiums 1540-554 building. According to Detective Coolick's police report, "Two callers

---

[1] In *United States v. Westley*, No. 22-3356, 2023 U.S. App. LEXIS 22357, at *20 (6th Cir. 2023), the Court took issue with the fact that the law enforcement database used to identify the Defendant was not named, and that such a statement was "conclusory and vague…"

reported that the individual who had shot the gun was from 1548 Ridgewick and that resident was identified as Daniel Kovacic." (Police Report, Def. Ex. D, p. 8).

Not one of the 911 callers between 4:05 to 4:48 PM stated that they personally saw anyone, let alone anyone from 1548 Ridgewick Dr. shoot a firearm. The first 911 caller's girlfriend, Jennifer Chaney, wrote a written statement to police which stated:

> "Took dog for a walk around 3 – 3:15 pm. At around 3:30 pm I heard 3 gun shots go off. About 3:35 I had my boyfriend call the police. At about 3:45 we heard more gun shots being let off but we are not able to figure out what direction the second set of shots came from. The first set of gun shots came from the top of the street."

(Witness Statements, Def. Ex. E). The third 911 caller, Hannah Green, stated the following in her written statement:

> "Heard 4 gunshots. Looked out front door and saw a younger white female at a 5'6" – 5'7" slim black male in front of the house where the incident happened. Female was on the phone and looked like she needed help as the male then pulled her back [unknown spelling] home. Second house west of Ridgewick. Called the police."

*Id*. at p. 2. The second 911 caller, Alyssa Dodaro, stated that she heard the alleged gunshots at approximately 3:45 PM and further stated the following:

> "I was outside playing with my kids and heard 4 to 5 gun shots. I ran toward the street to see if my son was ok. He was inside but I didn't see anything after that. The shots sounded like it came from the park lot across the street from my mother house 1599 Ridgewick."

*Id*. at p. 3. The seventh 911 caller, Michael Wojciechowicz did not contact dispatch until approximately 16:48 aka 4:48 PM. Mr. Wojciechowicz was the only 911 caller to claim to see a gun and/or person shooting a gun that day.

As a result, when looking at the totality of the calls placed to police dispatch on August 17, 2023, there were a variety of statements regarding what people heard, what was observed, what time a noise was heard, and where the noise was heard from. These statements contradict the later

false allegations of the Affiant who used 911 caller reports alone to wrongfully conclude that Daniel Kovacic shot a gun that day.

Shortly after Officers first arrived at Ridgewick, Patrolman Rosen spoke to two (2) individuals working on a car parked in the parking spot for 1557 Ridgewick. (Def. Ex. F, 2023-08-17_16-12-14 Ptl. Rosen- Clip)[2]. At 16:12 aka 4:12 PM, the Officer asked these individuals if they had heard "popping sounds." The female states that she "does not know if it was gunshots, it kind of sounded like fireworks." *Id*. at 16:13. They further stated that although they were outside the entire time in the parking lot, they did not see anything, they just heard it.

The Officer then dispatched that: "The residents over at 1557 heard them, they were thinking more over by Lee Terrace. **And they have a view of that side of the building of 1548 and reported not seeing anything**." *Id*. (emphasis added). Both of these individuals had been sitting outside the entire time with a view of 1548 Ridgewick and did not see anything. *Id*. Approximately one to two minutes later on the body camera, the resident of 1510 Ridgewick stated "I heard popping off maybe a half hour or 45 minutes ago." The Officer questioned, "that long ago?" and the resident stated "I would say ya." *Id*. at 16:17

At approximately 4:50 p.m. an officer also stated that the noise heard by residents could be attributable to construction equipment from the north, which was discussed but between Sergeant Krivacic and Patrolman Rosen, although never investigated. According to the CAD report at 4:49 pm, Officer 765 (Sgt. Sopko) "advised possible gunshot inside condo." Less than one minute later at 1650, Officer 760 (Krivacic) "advised he heard 2 bangs from the north possibly equipment, does not think it came from the inside." (CAD Report, Def. Ex. G, p. 2).[3]

---

[2] Due to the digital nature of this exhibit, a disk will be provided with Def. Ex. F to counsel for the government and the Court.
[3] The defense also argues that the CAD report contains numerous factual errors, including but not limited to: (1) At 16:05 hours, Jeffrey does not say "white male." It is clear on his 911 call that he did not see what happened or who

Based upon the foregoing, while Officers were on scene at Ridgewick, there were many other allegations made by witnesses and law enforcement as to what was heard and observed on August 17, 2023 as the possible cause of the noise reported to police dispatch, none of which included gunshots being fired outside of 1548 Ridgewick. The witness reports made directly to law enforcement Officers are contrary to the false reports in the search warrant Affidavit.

2.  **On arrival to the area by patrol officers, a witness Paul Spooner reported that the male had fired a gun in front of 1548 Ridgewick Dr and then went back inside the residence closing the door behind him**.

The entirety of the allegations contained in this paragraph of the Affidavit are false. Paul Spooner never witnessed anyone fire a gun on August 17, 2023. Paul Spooner did not witness Daniel Kovacic or anyone in front of 1548 Ridgewick Dr. shoot a gun and then go inside of the residence.

The defense retained an investigator who personally spoke with Paul Spooner regarding this incident. As documented in the attached written Affidavit regarding Paul Spooner's statements:

- He immediately quipped, "I don't know why people think I saw something. I didn't";

- He explained that he had just gotten off work when he noticed "cops" blocking off the road running around with AR-15s;

- One of the officers called him over and advised him that they received a call of someone shooting;

---

was shooting; (2) At 16:07 hours, Deborah repeated multiple times that she did not see the neighbor who she was speaking about that day. She never stated Michael Wojciechowicz's name or give any information to help law-enforcement identify Michael Wojciechowicz; (3) At 16:39 hours, 1550 Ridgewick was escorted out of their condo at this time not 1546, who was Keyona McQuater; (4) At 20:41 hours, the narrative of a "barricade" was falsely being reported as early as 4:48 PM which is 20 minutes prior to Kelly Siebert exiting the front door unobstructed by any barricade. Kelly Siebert informed officers that there was no barricade and that Kovacic was inside sleeping.

- He never told a police officer that he saw someone shooting; he does not know why or how this rumor started;

- He was only interviewed by police once;

- He does not recall if he prepared a written statement

(Investigator Affidavit, Def. Ex. H). Paul Spooner never made a written or recorded statement to law enforcement on or after August 17, 2023. Despite the fact that Wickliffe Police Department had a body camera policy in place for its law enforcement officers at the time of this incident, argued below and incorporated herein by reference, there is no documentation of this statement, or any statement, being made from Paul Spooner to law enforcement on August 17, 2023. None of the interactions with any of the witnesses referenced in the search warrant Affidavit (i.e. Kelly Siebert, Michael Wojciechowicz, Keyona, David etc.) were captured on any body camera video on August 17, 2023.

The Affiant uses the same language to describe Paul Spooner's false witness account in the Affidavit as he did for Michael Wojciechowicz. The use of this same or similar language by the Affiant further shows his intent to include false and/or misleading allegations from these individuals, which directly impacted the probable cause determination by the issuing Judge. Paul Spooner is the resident of 1550 Ridgewick, directly next door to 1548 Ridgewick and is familiar with the resident of 1548 Ridgewick. Further, Paul Spooner who is familiar with Daniel Kovacic, never told law enforcement that he saw Daniel Kovacic as the "male who fired a gun." This further shows that the allegations in the Affidavit were intentionally false.

Paul Spooner never told law enforcement that he was a witness to a shooting because he was not a witness to any shooting on August 17, 2023. As a result, the entirety of the allegations in this paragraph of the Affidavit are false.

9

3.  **Wickliffe Police Dispatch received a phone call from the residence of 1570 Ridgewick who stated he had witnessed the male from 1548 Ridgewick shoot several bullets from a gun and then walk back into his residence.**

The resident at 1570 Ridgewick did not identify the shooter as being "the male from 1548 Ridgewick" in his 911 call." He also does not state that the shooter then "walk[ed] back into the residence" as alleged in the Affidavit. The caller did state in part:

> WOJCIECHOWICZ: Okay, hi, this is not an emergency. What I'd like to do is report something. Maybe it is an emergency. I don't know.
>
> DISPATCHER: Okay. What do you need to report?
>
> WOJCIECHOWICZ: All right. I live in Wickliffe.
>
> DISPATCHER: Okay. What's your address?
>
> WOJCIECHOWICZ: My address is 1570 Ridgewick Drive.
>
> DISPATCHER: Okay.
>
> WOJCIECHOWICZ: I was sitting out in front of my condominium. This happened, I'd say between 3:45 and 4 PM. A <u>fellow across the way came out of another condo</u> and fired off a gun three times into the air. Loud. Loud gun. I didn't know what to do about it.
>
> ***
>
> DISPATCHER: Okay. All right. If we need to contact you back, we will give you a call, okay?
>
> WOJCIECHOWICZ: Okay. Now-
>
> DISPATCHER: We're in the middle of that situation right now, so if you saw this a while ago, my officers might need to speak with you and I'll give him your address and your phone number.
>
> WOJCIECHOWICZ: Wait a minute, was this already reported?
>
> DISPATCHER: Yes. We're trying to deal with that now, so I got to keep my lines clear. I will give the officers your information, okay?
>
> WOJCIECHOWICZ: Okay. Thank you very much.

(Wojciechowicz 911 Call- 3651937, Def. Ex. I).[4]

Michael Wojciechowicz was not familiar with and never identified the male or "fellow" he allegedly saw that day. He never identified Daniel Kovacic as the individual or "fellow" he allegedly saw shoot a firearm into the air. In his 911 call, Michael Wojciechowicz never stated what the alleged shooter did after shooting the firearm, and did not state that the person "walk[ed] back into the residence" He also never identified that the person he saw was the "resident" of 1548 Ridgewick. As stated in Officer Coolick's written report:

> "**Michael was not familiar with who the resident was there and was not familiar with who this male was. Michael agreed to complete a written statement.**"

(Wickliffe Police Report- Coolick, Def. Ex D, p. 9). Despite knowing this and including these details in his police report, the Affiant omitted this information from the Affidavit and falsely stated that Michael Wojciechowicz saw the male from 1548 Ridgewick on August 17, 2023.

Michael Wojciechowicz was unable to identify Daniel Kovacic as the person he allegedly saw with a gun on August 17, 2023. The person Wojciechowicz saw that day was someone that this neighbor was unfamiliar with. Michael Wojciechowicz never told law enforcement that he was familiar with the person he saw and never used Daniel Kovacic's name when speaking to law enforcement. Law enforcement never asked Michael Wojciechowicz to identify Daniel Kovacic, a name known to law enforcement at the time dispatch and law enforcement subsequently spoke with Michael Wojciechowicz. As a result, the allegations in this paragraph of the Affidavit are false.

4. **Affiant met with this resident, Michael Wojciechowicz, who stated that he had observed a white car park in front of 1548 Ridgewick and a blonde female exited and knocked on the door to 1548 before being let in by a white male. The same white male later exited the residence and fired a gun in the air with a handgun, shooting three**

---

[4] Due to the digital nature of this exhibit, a disk will be provided with Def. Ex. I to counsel for the government and the Court

**bullets before turning around and walking back inside, closing the door behind him. Michael completed a written statement.**

The loud noise reported as gunshots was heard between 3:30 and 3:45 PM according to the first 911 caller, 3:45 PM according to the second 911 caller, and between 3:45 and 4:00 PM according to Michael Wojciechowicz. The resident of 1510 Ridgewick told arriving patrol officers at 4:17 PM that the popping/gunshot noise occurred approximately 30 to 45 minutes ago, aka 3:42 to 3:47 PM. No one reported a gun shot or noise sounding like a gunshot was heard later than this. Kelly Seibert arrived at 1548 Ridgewick at approximately 4:00 pm on August 17, 2023. Phone records confirmed that Siebert called Daniel Kovacic at 3:53 PM, right before her arrival. Daniel Kovacic unlocked the door and she entered the residence. Daniel Kovacic was not visible to anyone outside at that time. The Affiant added the false details that Michael Wojciechowicz observed a female being "let in by a white male" and that "the same white male later exited the residence" to the arrest warrant Affidavit and the search warrant Affidavit. This false statement was not made in the 911 call.

In the attached Affidavit, the investigator spoke to Michael Wojciechowicz on the telephone regarding the above captioned incident, who stated:

    a. He does not recall having seen any visitors at 1548 Ridgewick on August 17, 2023.

    b. He does not recall having seen anyone in the visitor parking area before or after the incident at issue.

These statements directly contradict the conclusions in the Affidavit, further warranting an evidentiary hearing and a *Franks* hearing.

Hours after law enforcement arrived on scene, the Affiant, James E. Coolick allegedly called Michael Wojciechowicz and briefly spoke with him over the phone. (Wickliffe Police Report- Lieutenant Coolick, Def. Ex D, p. 8). This conversation was not recorded, in violation of

Wickliffe Police policy, as argued below and incorporated herein by reference. Wojciechowicz informed the Officer that he was at the Euclid Public Library. Due to a bad telephone connection, Coolick stated that he went to the library to meet with Michael. This meeting was also not recorded, as argued below.

The Affidavit alleges that Michael Wojciechowicz completed a written statement, however, that is also not true. Lieutenant Coolick completed Michel Wojciechowicz's written statement. In the attached Affidavit, the investigator spoke to Michael Wojciechowicz on the telephone regarding the above captioned incident, who stated "A Wickliffe police officer…wrote out his statement as he 'dictated'; he does not recall why the officer wrote in the statement; he does not recall discussing this with the officer beforehand." (Investigator Affidavit, Def. Ex H). Not only did Michael Wojciechowicz not write the statement, he also did not review the statement prior to signing it. Had Michael Wojciechowicz reviewed the written statement, he would have noticed right away that the written statement contradicted his statements that were made to the Investigator, documented above in the Affidavit.

The Affiant included statements that were not provided by Michael Wojciechowicz in his 911 call, his police report, and the written statement the Officer wrote for Wojciechowicz, as argued above. The following statement in the Affidavit was false and was never made by Michael Wojciechowicz to law enforcement that day: "The same white male later exited the residence and fired a gun in the air with a handgun, shooting three bullets before turning around and walking back inside, closing the door behind him."

Not only did the Affiant create and include these false statements that Michael Wojciechowicz never made in the Affidavit, he further failed to include the statement that Michael was not familiar with the person he allegedly saw shoot a firearm that day. The Affiant included

the specific detail that Michael was not familiar with the person he saw that day in his police report, yet somehow omitted this crucial fact from his Affidavit to the issuing Judge. Law enforcement was deficient in failing to have Michael provide any physical or actual description of who he observed that day.

After speaking with Michael Wojciechowicz, which was not recorded, the Affiant made several knowingly false statements regarding what Michael said and observed in the Affidavit. The Affiant also failed to include the important statement from Michael Wojciechowicz that he was not familiar with who the person was that he saw do this on August 17, 2023. Michael Wojciechowicz was the neighbor to 1548 Ridgewick who allegedly observed this from his front porch according to the Affiant's police report. These details were also omitted from the Affidavit which would have been relevant to the issuing Judge's probable cause determination. As a result, the allegations in this paragraph of the Affidavit are false.

5. **Patrol officers later detained the blonde female leaving the residence, identified as Kelly Siebert. Det. Fitch interviewed Siebert who stated that she was at the residence with her boyfriend, Daniel Kovacic, who was the only other person there. She further stated that no one else entered or exited the residence other than Daniel. Siebert confirmed that she has seen Daniel with a handgun in the recent past and that he keeps it concealed in a couch.**

Kelly Siebert, never saw Daniel Kovacic with a handgun/firearm and never told law enforcement that she had ever seen Kovacic with a handgun/firearm. Kelly Seibert told law enforcement that she had only known Daniel Kovacic for approximately three (3) weeks. Kelly Siebert was detained and questioned by law enforcement for at least four (4) hours after she left the residence at 1548 Ridgewick on August 17, 2023. Siebert told law enforcement numerous times that after she arrived at the residence, Daniel Kovacic did not exit the residence while she was there. The statement that Kelly Siebert had seen Daniel Kovacic with a gun in the recent past was false. At no point, during any of her multiple statements to law enforcement did Kelly Siebert

14

ever state that she saw Daniel Kovacic with a handgun/firearm. She was asked repeatedly during those multiple hours of interviews if she had ever seen Daniel Kovacic with a gun, and Siebert repeatedly stated that she hadn't seen him with a gun and did not see him with a gun on August 17, 2023. No such allegation is contained within any of the written reports (Det. Fitch, Didoda, and/or Cook) produced by law enforcement. Kelly Seibert was consistent in her statements made to law enforcement that day.

Siebert was at the residence with Daniel Kovacic on August 17, 2023 and told law enforcement that she did not hear any gunshots or see Daniel Kovacic with a gun on August 17, 2023. She never reported witnessing a loud noise or seeing anyone shoot a firearm on August 17, 2023. Siebert was also unaware that law enforcement had surrounded the residence and set up a perimeter around the residence before she exited the residence, further supporting Daniel Kovacic's later statements to law enforcement that he had no idea law enforcement was outside of the residence for four to five hours. All of these details, which were known to law enforcement, were omitted from the Affidavit.

In her written statement to police, Kelly Siebert stated in part:

> "This morning, I left about 10 after he started working. I went home to Charden about 330 left there to come back to Wickliffe to his house. He answered the door and was on work calls so he gestured not to talk to him and I went upstairs to the bathroom (about 20 minutes). When I came down he was on a different work call & what sounded like concern for possible termination. I made some food for him which he ate. I went back in kitchen to feed Paisley (his dog). When I got back he didn't say much to me and leaned over and fell asleep. I wrote a note stating I'd be back after 8 and had his other phone to get ahold of him when I was done with my class. I walked out the door and walked to my car and was told to put my hands up and get down on the ground. I then became aware of police presence and was notified of the situation at hand. Prior to me walking out the door I didn't realize the events that occurred to cause that."

(Siebert Written Statement, Def. Ex. J). Ms. Siebert's statements about Daniel Kovacic advising her to be quiet because he was on work calls also directly contradicts the Affiant's allegations that loud music was being played inside of 1548 Ridgewick at the time of the alleged gunshot noise.

Law enforcement knew approximately twenty (20) minutes after they arrived at the 1500 block of Ridgewick that Daniel Kovacic was inside the residence of 1548 Ridgewick sleeping. Despite this knowledge that Daniel Kovacic was inside sleeping, law enforcement intentionally, and without any basis in fact, continued to incorrectly state that this situation was a "standoff" between Kovacic and police.

The defense has retained an investigator who personally spoke with Kelly Siebert regarding this incident on August 17, 2023. As documented in the attached written Affidavit, Ms. Siebert was very cooperative and stated the following:

- She never told the police that she saw Daniel with a gun; she told the police on multiple occasions that she never saw Daniel with a gun;

- She never observed Daniel exit or reenter the apartment;

- She never [saw] Daniel place a gun in the couch or remove a gun from the couch.

(Investigator Affidavit, Def. Ex. H).

Kelly Siebert confirmed that she never saw Daniel Kovacic exit or re-enter the apartment after her arrival. As a result, based upon the statements of Kelly Siebert, the above captioned statement included in the Affidavit is further false, "a blonde female exited and knocked on the door to 1548 before being let in by a white male. The same white male later exited the residence and fired a gun in the air with a handgun." This statement made by the Affiant in the Affidavit, as argued in subsection four (4) above and incorporated herein by reference, is directly contradicted by Kelly Siebert's own statement that she never saw "never observed Daniel exit or reenter the

apartment" after her arrival. Based upon the foregoing, this statement included by the Affiant is false. Siebert repeated her statements multiple times which contracted what was alleged in the Affidavit. This further shows that Affiant knowingly and intentionally included false information in his Affidavit.

The allegation in the affidavit that "Siebert confirmed that she has seen Daniel with a handgun in the recent past" was knowingly false and intentionally included by the Affiant in his search warrant Affidavit. The Affiant also failed to include numerous relevant statements from Siebert in the Affidavit in support of the search warrant, including that she had only recently met Daniel Kovacic, had never seen him with a gun, that he had been working, eating and sleeping prior to her exit, and she knew nothing of him shooting a gun that day or being in a barricaded or in a standoff that day.

**6. Affiant applied for and received a warrant for the arrest of Daniel for Having Weapons While Under Disability. While obtaining the warrant, Daniel exited the residence and surrendered to patrol and ERT officers.**

The arrest warrant obtained for Daniel Kovacic also included numerous false statements and directly contradicts some of the statements made by the Affiant in the search warrant Affidavit. (Arrest Warrant, Ex. K). The arrest warrant Affidavit was submitted by Detective Jame Coolick, the same Affiant as the search warrant Affidavit. The arrest warrant states in relevant part:

> "On August 17, 2023 at approximately 605 the Wickliffe Police Department received numerous calls for a report of gunshots fired in the 1500 block of Ridgewick Dr. Several residents reported seeing a white male shooting a gun off in the air in front of 1548 Ridgewick. I spoke with one witness, Michael Wojciechowicz, who observed the male walk out of 1548 Ridgewick shortly after letting a blond female inside the residence. Michael observed this male hold his hand in the air and fire several shots into the air and then walk back into 1548. The female visitor to that residence has been identified at Kelly Siebert who stated that no one other than her boyfriend, Daniel Kovacic, has been to the residence while she was there today. She has also told us that she has seen a gun in the couch

17

> on previous occasions. A next door neighbor also stated to me that
> he was threatened by Daniel a few weeks ago when Daniel pulled a
> small caliber handgun and pointed it at his chest. Daniel is a
> convicted felon with several felony convictions placing him under
> disability. Daniel is the listed resident of 1548 Ridgewick.

The arrest warrant contained numerous false allegations, including that "several residents reported seeing a white male shooting a gun in the air in front of 1548 Ridgewick." There was only one alleged witness to this alleged gunfire, Michael Wojciechowicz, not "several." The Affiant knew this when he made the false statement in the Affidavit. According to his police report, after arriving at Ridgewick and speaking to Seibert and Keyona McQuater and "numerous residents" behind the police perimeter, the Affiant had to leave Ridgewick and the City of Wickliffe to meet with Michael, the only alleged witnesses to a shooting that day. The Affiant includes in the arrest warrant the false statement that "several residents" had reported this, when he knew that Michael gave the only known report.

In addition, the Affiant falsely distorted the statements that Michael Wojciechowicz provided to law enforcement that day. Wojciechowicz was clear that he was unfamiliar with who the male was and could not identify him as the resident of 1548 Ridgewick. Not one other resident reported that they personally saw anyone with a gun or shooting a gun on August 17, 2023. In addition, not one resident reported that they saw Daniel Kovacic, or a resident of 1548 Ridgewick with a gun or shooting a gun that day.

In addition, Kovacic did not "surrender' to police on August 17, 2023. Kovacic had no knowledge that law enforcement officers were even outside of his home during this incident. Once Officers made the first attempt to contact Kovacic, the report notes that Kovacic was taken into custody without incident. Falsely including the allegation that Daniel Kovacic "surrendered to law enforcement" was only included by the Affiant to further the false narrative that there was a "standoff" between Kovacic and law enforcement on August 17, 2023.

Law enforcement did not need an arrest warrant to approach the residence that day, however, law enforcement informed many individuals that they were not approaching the residence until they obtained an arrest warrant. The Officers as a result not only created the events that occurred on August 17, 2023, and their own inactions in what lengthened their false narrative as to a standoff. Sgt. Sopko told Detective Coolick at approximately 5:11 PM on a recorded body camera after Siebert had left the residence and spoke to law enforcement "there is no rush now, especially since the girlfriend is out." (*See* Sgt. Sopko body camera). Approximately four (4) hours into the false standoff, the Affiant contacted Sgt. Sopko on his way to obtain the arrest warrant. Shortly after that, law enforcement made their first attempts to alert Daniel Kovacic to their presence outside of the residence.  In Detective Cook's written report, he indicates "After several hours, it was learned that there had been no contact with Kovacic, so ERT members approached the home and began calling out to Kovacic." (Police Report, Def. Ex. D, p. 6).

Notably the arrest warrant Affiant does not include the false statement that Kelly Siebert "has seen Daniel with a handgun in the recent past." This false statement was later included in the search warrant Affidavit, as argued above and incorporated herein by reference. The totality of these sworn false statements in the arrest warrant, in addition to the false statements that were later included in the search warrant Affidavit, render the arrest warrant itself invalid. For probable cause to exist, "the facts and circumstances known to the officer" must be sufficient to lead a "prudent man" to believe an offense has been committed. *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (citation omitted). As a result of the arrest warrant failing to establish probable cause, the search warrant should also be deemed invalid, warranting dismissal of the charges against Kovacic.

The totality of these false narratives establish that the allegations contained within the Arrest Warrant Affidavit and this paragraph of the Search Warrant Affidavit are false.

7. **Affiant spoke with a neighbor located at 1546 Ridgewick who stated that she heard loud music coming from 1548 prior to this incident which is not uncommon. She then heard several gunshots coming from what sounded like the residence of 1548 and then the music was turned off and never turned back on.**

Keyona McQuater resided at 1546 Ridgewick on August 17, 2023. Ms. McQuater never told law enforcement that she heard loud music coming from 1548 Ridgewick prior to hearing gunshots. This allegation regarding the turning off and on of loud music was not made by McQuater to law enforcement in her 911 call, written statement, or oral statement provided and documented by law enforcement. According to Wickliffe Police Incident number 23-01725 report from Detective Merrifield:

> "At 1546 Ridgewick, I met with Keyona McQuater who was the female that was evacuated from her home at the time of the incident. Keyona stated she did not see anything, but heard 4 gunshots go off. She stated she looked outside but did not see anyone except her neighbors across the street. Keyona stated she then called 911. Keyona completed a written statement."

(Wickliffe Police Report- Detective Cook Merrifield, Def. Ex D, p. 11). The front area of 1548 Ridgewick was immediately visible to McQuarter at her residence. Ms. McQuarter completed a written statement. At no point in her recorded or written statements to police did she mention any loud music coming from 1548 Ridgewick before or after she heard the alleged gunshots. In fact, in her emergency call to police prior to them arriving on scene, she stated the exact opposite:

> MCQUARTER: Yeah. I didn't hear any commotion or anything. He plays his music really loud sometimes, but I didn't hear any commotion.
>
> DISPATCHER: You heard an argument?
>
> MCQUARTER: No, I didn't. I didn't hear any commotion. It was just... I'm sitting eating dinner with my son and I just heard the gunshots go off.

(911 call 3651791, Def Ex. L).[5] Ms. McQuarter never reported that on August 17, 2023 she heard loud music coming from 1548 Ridgewick that day, heard shots fired, and then heard the music stop, as alleged in the Affidavit. In fact, her reporting to dispatch stated exactly the opposite, that she did not hear any commotion, music, or arguments coming from her neighbor that day.

The defense has retained an investigator who personally spoke with Keyona McQuarter regarding this incident. As documented in the attached written affidavit:

- She was in her kitchen with her son eating Chipotle;

- She was on the phone when she heard three to four gunshots;

- She did not see who fired the gunshots;

- She is unable to see out into the front from where she was in the kitchen;

- She and her son went upstairs within fifteen seconds; she did not see [Kovacic] or anyone with a firearm.

(Investigator Affidavit, Def. Ex. H). The Affiant never personally spoke with Keyona McQuater regarding the events of August 17, 2023 and included false statements in his Affidavit associated with McQuater.

Keyona McQuarter did not see anyone shoot a gun on August 17, 2023 and did not see Daniel Kovacic with a gun or shoot a gun on August 17, 2023. Based upon the foregoing, this paragraph of the Affidavit contains false allegations that were fabricated by law enforcement.

## 8. Ptl. Blair located one shell casing in the grassy area directly in front of 1548 Rigewick Dr.

There was no shell casing recovered from the grassy area directly in front of 1548 Ridgewick Dr. by law enforcement on August 17, 2023. Both shell casings located by Patrolman

---

[5] Due to the digital nature of this exhibit, a disk will be provided with Def. Ex. L to counsel for the government and the Court

Blair were in front of 1550 Ridewick, not 1548 Ridgewick. This is further documented in the Police Report which states ".380 SHELL CASING was located in mulch bed of 1550 Ridgewick" and .380 Shell Casing was located in front yard of 1550 Ridgewick..." (Wickliffe Police Report, Def. Ex. D, p. 16). The use of the word "directly in front of 1548 Rigewick Dr." was knowingly and intentionally false. This shell casing(s) were also inconsistent with the type of firearm described in the Affidavit, another fact that was omitted by the Affiant. In addition, law enforcement had no knowledge as to how or when these shell casing(s) were placed there, including how long either had been there. As a result, based upon the statements made in the Wickliffe Police Report, this statement included in the Affidavit was false.

**9. Det. Cook and Fitch attempted to speak with Daniel after his arrest but he refused to make any statements regarding the incident.**

Once Daniel Kovacic was taken into custody, there is approximately twelve (12) minutes and forty-five (45) seconds of body camera video taken on August 17, 2023, documenting Kovacic speaking with law enforcement after his arrest. The conversation occurred at approximately 22:26 aka 10:26 pm between Detective Cook, Detective Fitch, and Mr. Kovacic. (WCS- Video Interview Kovacic, 2023-08-17_22-26-54 Det. Cook, Def. Ex. M).[6] This was the only time Officers Cook and Fitch interviewed Daniel Kovacic. Contrary to the allegations in the Affidavit that "he refused to make any statements regarding the incident," Daniel Kovacic did speak with Officers at length, stating in part:

> KOVACIC:    Honestly, I almost want to answer them because I didn't do anything wrong, man. But I know I'm not supposed to talk to you guys. I mean, haven't talked to my attorney yet and I'm not going to. And no disrespect to you-
>
> COOK:        Dude, that's your right.

---

[6] Due to the digital nature of this exhibit, a disk will be provided with Def. Ex. M to counsel for the government and the Court

KOVACIC:      ... I haven't done anything wrong though. And this is kind of ridiculous because I don't want to do anything wrong, but you guys came full force with the fucking military damn near in my fucking front yard and-

                                    ***

KOVACIC: I didn't do anything, man.

                                    ***

KOVACIC:      I didn't do anything wrong and I'm dead asleep and you guys are sitting out there for God only knows... How embarrassing to me. How am I supposed to go back to where I live? And you got the SWAT team sitting outside my house.

COOK:         I understand that.

KOVACIC:      For hours, according to them, right? That's what they told me. They said, "We've been out here for hours."

FITCH:        We were.

COOK:         Yeah, I was there.

KOVACIC:      I was asleep. You guys, did you guys knock on the door? Because I didn't hear it if you did.

FITCH:        No.

KOVACIC:      No one knocked on the door?

FITCH:        Go ahead.

                                    ***

COOK:         Okay. I can answer whatever questions you'd like if you want to ask them to me.

KOVACIC:      Yeah, I mean, you guys never knocked on the door

COOK:         The SWAT team did not knock on the door. No.

KOVACIC:      No one ever knocked on the door. Nobody.

COOK:         No. We called out for you though.

FITCH:        And we called your phone multiple times.

COOK:          We called your phone multiple times.

KOVACIC:     Oh, my phone's probably on silent.

COOK:          Yeah, it probably was.

KOVACIC:     I mean, why would no one knock on the door or ring the doorbell?

COOK:          Well, just because of the way things transcribed and the way it played out. We do things the safest way possible for us in the public. So the safest way to do that was to keep a distance and call out to you using a PA system.

KOVACIC:     So for hours, you guys were on a PA system, but no one ever knocked on the door or ringed my doorbell.

COOK:          That's true.

KOVACIC:     And for hours, you guys were on a PA system and I never heard it.

COOK:          I'm not saying that you did hear it. Nobody's saying that.

\*\*\*

KOVACIC:     Okay. Why were you guys in my house without a warrant?

COOK:          Well, we were on the exterior of your home.

KOVACIC:     No, you guys were inside my house. I saw them. They went inside my house. I said, "Is there a warrant?" I said, "I do not consent to anyone being in my house." And they said, "We're waiting on a warrant for the judge to do a protective sweep." Is that what it's called?

COOK:          So we did do a protective sweep, which we do not need a warrant for.

FITCH:         We don't need a warrant.

\*\*\*

KOVACIC:     I didn't do anything wrong. So it's kind of ridiculous to me that I got the United States fucking Army and military outside my house. It's a strange thing. Very strange.

24

***

KOVACIC:    Just understand, I've done nothing wrong, man. I've done nothing wrong.

COOK:    Okay.

KOVACIC:    I understand, my mom said this is on the news. I understand that you guys probably got to make that look like... I did nothing wrong. I'm sitting here right now. I did nothing wrong, man.

COOK:    Okay.

***

COOK:    We will, I promise you, investigate it to our fullest. And if you did nothing wrong in the end, then all right, shame on us. All right?

KOVACIC:    I'm not shaming on you guys at all, but I'm just saying don't look at it from just an angle that I have to be guilty because the cops were in my front yard. I didn't do anything wrong.

COOK:    We don't do that.

FITCH:    That's why we asked to hear your side of the story as well.

KOVACIC:    Well, I don't have a side of the story. I pretty much told it to you guys. You guys heard it. I mean, I know very little. You guys know a lot more. So I'm asking you guys a question. I'm asking what the hell's going on? If you guys can't tell me that, I have nothing to say. Everything you saw is what I know, right? I mean, I'm surprised that you guys were out there for hours because I wasn't sleeping hard. I'm a very light sleeper. And if you guys were yelling...

FITCH:    Well, again, we were were calling your phone.

KOVACIC:    My phone was not going to ring. My phone is always on silent. Always.

FITCH:    Well, we don't know that, right? I mean, I don't know-

KOVACIC:    Right. No, you guys don't know that, but I mean, for hours and no one thought to knock on the door or ring the doorbell?

25

COOK:        Well, I already explained to you, we do things in the safest-

KOVACIC:    But for hours.

COOK:        Yes, we do things the safest way possible for us and for everybody else involved.

KOVACIC:    Even with the ride shield and everything, no one's going to knock on the door or ring the doorbell?

COOK:        Yes, that's correct. Yeah.

KOVACIC:    And if I never answered that door, what'd happen? You guys would've been out there for weeks?

COOK:        Well, we would've made entry into the home.

KOVACIC:    Eventually, you would enter?

COOK:        Mm-hmm.

KOVACIC:    Okay. That's a fair answer. I would've answered. I mean, I did. I answered as soon as I knew you guys were out there. But it's just strange to me that you said you were out there for hours and I don't understand why... I mean, if you guys were yelling in the house, I should have heard it, but calling my phone, I wouldn't have heard.

COOK:        Yeah. I mean, we made several announcements through our very loud PA system. All right? We also, you saw that gigantic truck that was outside. The thing is incredibly loud.

KOVACIC:    That's what woke me up is I heard either that pulling in or pulling out or making some type of noise. I'm like, what is that? It sounds like someone's out here doing work. I wake up, I look and you guys have the thing in my face. I mean, that is insane to me when they said we've been out here for hours. It's like, it's impossible almost.

                                        ***

FITCH:        So real quick, Dan, our primary concern was to make sure that you were okay. Okay? And our second concern... is that we're getting a search warrant for the house. And if it gets signed, our primary focus is on that firearm that's in your house. Now you can either tell us where it is-

26

KOVACIC:        I don't have a firearm in my house.

                          ***

FITCH:          So either you can tell us where the firearm is so we don't have to tear up your whole house, or we're going to have to go through your whole entire house until we find that gun.

KOVACIC:        There's no firearm in my house.

FITCH:          Okay, so you don't want to tell us where it's at?

KOVACIC:        There's no firearm in my house.

FITCH:          Okay.

(WCS- Video Interview Kovacic, 2023-08-17_22-26-54 Det. Cook, Def. Ex. M). The interview then concludes with the Officers asking if Kovacic has any other questions for them. The conversation was also documented in Wickliffe Police Incident number 23-01725 report from Detective Cook, which stated in part:

> "Det. Fitch and I then went into the WPD jail where we met with Kovacic. He was first read his Miranda rights, and he refused to sign the WPD Miranda rights form. Kovacic indicated that he wished to speak with his attorney before speaking with officers, however without prompting, he continued speaking about the incident. **Kovacic indicated that he was upset with the large police presence at his home and indicated that he was sleeping during the entirety of the incident**. Kovacic further stated that he did not want to answer any of my questions without an attorney present, but stated that he had questions for me. Kovacic was mainly concerned with the ERT entering his home without a warrant and it was explained to him that a protective sweep was conducted, however his home had yet to be searched. It was explained to Kovacic that we were in the process of writing a search warrant for his home and suggested that should there be a firearm in the home, it would be best to disclose that to us. **Kovacic stated that there were not any firearms in his home.** Once Kovacic stated he did not have any further questions for us, he was placed back into cell B for court in the morning. Again, this is a synopsis of the interview and the entire interview was captured on both my body worn camera as well as the WPD jail camera.
>
> Once completed with the interview, Det. Lt. Coolick advised that he had completed a search warrant for Kovacic's condo. Det. Lt.

> Coolick and I met with Judge Cornachio of the Willoughby Municipal Court and she signed a search warrant for his home."

(Wickliffe Police Report- Detective Cook Excerpt, Def. Ex D).

Immediately after the interview with Daniel Kovacic, Detective Cook accompanied the Affiant to get the search warrant signed, knowing that the false allegations about Daniel Kovacic not speaking to law enforcement was included in the Affidavit. This further shows the intent of law enforcement to include false and misleading statements in the Affidavit.

Based upon the foregoing, the following statement in the Affidavit was clearly false, "Det. Cook and Fitch attempted to speak with Daniel after his arrest but he refused to make any statements regarding the incident."

As demonstrated above by both the recorded interview and Wickliffe Police Incident Report, Daniel Kovacic made many statements to law enforcement regarding this incident that were not included in the Affidavit. Daniel Kovacic twice stated to law enforcement that he did not have a gun in the home. He told law enforcement at least three times that he was inside of the residence sleeping. He also stated that he always keeps his phone on silent and that he did not know anyone was trying to contact him on his phone that evening.

Daniel Kovacic stated that he did nothing wrong that day. Despite over twelve (12) minutes of statements that were made after Kovacic's arrest regarding this incident, the Affiant included the false allegation that Daniel Kovacic "refused to make any statements regarding the incident." In addition to this false allegation, the Affiant made significant omissions to his Affidavit by failing to include the statements made by Kovacic after this incident to law enforcement, including but not limited to the fact that he does not have a gun, was inside the residence sleeping during this alleged "standoff," had his phone a silence the entire time, and had done nothing wrong that day.

28

The statements of Daniel Kovacic were intentionally omitted from the search warrant Affidavit and replaced with the false statement that Kovacic refused to make any statements to law enforcement regarding this incident.

The issuing Judge was misled by the totality of the false statements included in the search warrant affidavit and the intentional omissions from law enforcement, warranting suppression of all evidence obtained as the appropriate legal remedy.

**10. Affiant met with the neighbor at 1550 Ridgewick, David Spooner, who stated that two weeks ago, he got into an argument with Daniel about him playing his music too loud. The argument escalated and Daniel pulled a 9mm silver pistol out, "racked the slide" and pointed the gun at David's chest threatening him. David completed a written statement.**

The allegations of David Spooner about an incident that allegedly occurred two (2) weeks prior to August 17, 2023 were false and further falsely included by the Affiant in his Affidavit. In addition, this alleged statement between David Spooner and the Affiant was not recorded on any body camera or dash camera. David Spooner's written statement in the Wickliffe Police Report states: "two weeks ago we got in a argument about his music and we said we would fite he pulled a gun on me and cocked it back with a laser pointed on my chest." (Spooner, David- Written Statement, Def. Ex. N). The written statement of David Spooner does not state anything about a "9 mm silver pistol" in his allegations. The written statement also does not state that he "racked the slide" or that Dan "threatened him." The written statement in the Affidavit also does not match the Affiants written statement regarding David Spooner in the arrest warrant Affidavit, which states "A next door neighbor also stated to me that he was threatened by Daniel a few weeks ago when Daniel pulled a small caliber handgun and pointed it at his chest." (Arrest Warrant, Def. Ex. K). The arrest warrant Affidavit further supports the defense's allegation that David Spooner never stated "9 mm silver pistol" to the Affiant.

The Affiant further has a duty to not include false statements in his Affidavit. The written statement made by David Spooner was never previously reported to the police on the date this allegedly occurred. David Spooner informed Affiant, Detective Coolick, that he never previously reported this incident to police. (Wickliffe Police Report, Ex. D, p. 8). The alleged statements from David Spooner were not corroborated by any other sources.

Here, the Defendant has also completed the attached Affidavit contesting the allegations made by David Spooner approximately two (2) weeks prior to August 17, 2023. (Kovacic Affidavit, Def. Ex. O). Based upon the foregoing, the limited allegations made by David Spooner were false and the Affiant was negligent when he included these false statements in his Affidavit. Further, the Affiant also included false allegations in the Affidavit that were not attributable to David Spooner, further warranting an evidentiary or *Franks* hearing.

## IV.  LAW AND ARGUMENT.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Fourth Amendment, incorporated by the Due Process Clause of the Fourteenth Amendment, applies equally against the states to protect individuals from illegal action. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684 (1961). Any evidence which is the product of the illegal search must be suppressed, and any subsequent evidence obtained as a result of such illegality should be suppressed, to wit: fruits obtained from a poisonous tree. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407 (1963).

In order to conclude that an affidavit establishes probable cause, the issuing judge must find that "given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The affidavit must suggest that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought and not merely that the owner of the property is suspected of a crime. *United States v. McPhearson,* 469 F.3d 518, 524 (6th Cir.2006) (*quoting Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978)).

As argued herein, law enforcement and the Affiant misled the issuing Judge by including false statements in the Affidavit used to obtain a search warrant of 1548 Ridgewick on August 17, 2023. These false statements were made knowingly and intentionally, or with reckless disregard for the truth, and the statements were necessary to the finding of probable cause. *United States v. Neal*, 577 F. App'x 434, 450 (6th Cir. 2014) (quoting *Franks v. Delaware*, 438 U.S. 154,155-6, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). A defendant is entitled to an evidentiary hearing on the veracity of a warrant affidavit if (1) "there is a substantial preliminary showing that specified portions of the affiant's averments are deliberately or recklessly false and (2) a finding of probable cause would not be supported by the remaining content of the affidavit." *United States v. Atkin*, 107 F.3d 1213, 1216-17 (6th Cir. 1997) (quoting *United States v. Campbell*, 878 F.2d 170, 171 (6th Cir. 1997)); see also *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013) (citing *Franks*, 438 U.S. at 171-72; *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).

Law enforcement also intentionally failed to include relevant statements that directly contradicted their false statements, resulting in material omissions from the search warrant Affidavit. Had law enforcement included this material information in the Affidavit, it would have

31

been sufficient to undermine probable cause. The defense respectfully requests an evidentiary hearing and/or a *Franks* hearing to address the totality of the allegations contained herein. This Honorable Court should evaluate the totality of the false statements made by the Affiant when evaluating the Affiant's state of mind regarding all of the false aspects of the Affidavit.

In addition to the arguments above, the search warrant for 1548 Ridgewick Dr. was also obtained in violation of the Ohio Rules of Criminal Procedure and the Ohio Revised Code. Ohio Crim. R. 41(C), which states in part: "The warrant shall be executed in the daytime, unless the issuing court, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." In accordance with Ohio Crim. R. 41(F), "daytime" is used in this rule to mean the hours from 7:00 a.m. to 8:00 p.m. The procedure to be followed in executing a search warrant is set forth in O.R.C. 2933.24(A), which states:

> "The warrant shall command the officer or individual to search the place or person named or described for the property, and to bring them, together with the person, before the judge or magistrate. The command of the warrant shall be that the search be made in the daytime, unless there is urgent necessity for a search in the night, in which case a search in the night may be ordered."

The Affiant states in relevant part:

> "Affiant avers that the arrest of Daniel occurred in the nighttime and there is insufficient means available to maintain property security of the residence in order to execute the warrant during the daytime, therefore requesting the search be made in the nighttime."

(Search Warrant, Def. Ex. A, p. 5).

Although Willoughby Municipal Judge Cornachio authorized that the search be performed in the "daytime or the nighttime" the search warrant here did not contain sufficient facts to establish that a nighttime search was necessary and permissible. No specific reasons, facts, or exigent circumstances supporting a nighttime search were included in the Affidavit. The allegation that the arrest of Daniel Kovacic occurred in the nighttime was as a direct result of law enforcement

failing to approach the residence for approximately five (5) hours while Daniel Kovacic was inside sleeping. Law enforcement should not be permitted to seek benefits for their own inaction here. The totality of the allegations against Kovacic on August 17, 2023 occurred during the day and there were no sufficient facts in the four corners of the Affidavit to support the issuance and execution of a nighttime search warrant in this case, further warranting suppression of this illegal and unlawful search.

Although law enforcement did not discover any unlawful or illegal contraband during their protective sweep that was performed in this case, the defense does contend that the protective sweep was unlawful. Daniel Kovacic made it clear to law enforcement after he was taken into custody that he did not consent to the search of his residence. When questioned, law enforcement denied even conducting a protective sweep to the Defendant. Although law enforcement records and body camera(s) do not exist regarding this protective sweep, it is believed that Det. Sgt. Cook (Wickliffe PD), Sgt. Crowley (Willoughby PD), and Sgt. J. Cook (Willowick PD) entered the residence and performed the protective sweep.

Officers may conduct a protective sweep if they have evidence that there are armed individuals in the home or to prevent anyone inside from destroying drug evidence. *Maryland v. Buie*, 494 U.S. 325, 334 (1990) (officer safety); *United States v. Sangineto-Mirand*a, 859 F.2d 1501, 1512 (6th Cir. 1988) (evidence destruction). Only when "articulable facts" show "that the area to be swept harbors an individual posing a danger to those on the arrest scene" may the officers conduct such a sweep. *Buie*, 494 U.S. at 334. Nothing in the record demonstrates that a dangerous individual or that any other individual was inside of the residence. In addition, law enforcement failed to even secure this residence after the protective sweep and prior to obtaining a search warrant. Based upon the foregoing, the protective sweep in this case was unlawfully performed

and further, law enforcement failed to secure the residence prior to obtaining the search warrant in this case, both of which should be considered under the totality of the circumstances when evaluating the totality of the arguments contained herein.

The police created the exigencies in this case for over five (5) hours when they falsely created the narrative that a standoff occurred here. After dozens of police were surrounding Ridewick needlessly for five (5) hours, only one Officer was left at the residence until the search warrant was ultimately obtained. As a result, the residence was not secured during this time frame.

As a result, the defendant argues that Wickliffe Police exceeded the scope of the search warrant, further warranting suppression of this unlawful search.

## V.      MOTION TO DISMISS.

The Court may dismiss an indictment where "outrageous government conduct" results in a violation of a defendant's right to due process. *United States v. Napier*, 787 F.3d 333, 341 (6th Cir. 2015). "[O]utrageous government conduct outside the grand jury process can result in dismissal on due process grounds if such conduct is so outrageous that it violates 'fundamental fairness' or is 'shocking to the universal sense of justice.'" *Id*. (quoting *United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)). Even if the Government's conduct were to fall short of a due process violation, the Court may nonetheless choose to exercise its supervisory power to dismiss the indictment. *United States v. Adamo*, 742 F.2d 927, 941 (6th Cir. 1984).

Wickliffe Police violated WPD Body Worn Camera Policy 3.22 when investigating the events of August 17, 2023. (WPD Body Camera Policy, Def. Ex. P). For example, none of the interviews and interactions in the search warrant affidavit were captured on body camera, as argued above and incorporated herein by reference. The protective sweep was not recorded and there were no recordings of the Officers executing the search warrant. Virtually none of the four (4) hours

34

Seibert was detained and questioned, as well as all of law enforcement's interactions with Daniel Kovacic's family were not recorded. Many of the allegations from Daniel Kovacic's family that were contained within the police report and not recorded are disputed by those family members. Therefore, the defense alleges that there are false statements alleged in the police report, as well as the arrest and search warrant affidavit as argued herein. The lack of body camera video, which was required to be taken and preserved by departmental police, would have shown that these statements were false.

As a result of this violation of departmental policy, important and significant evidence in this case was either not obtained, not properly documented, and/or not properly preserved, prejudicing the defense. Pursuant to Fed. Crim. R. 16 and the defense's discovery requests, as well as, all supplemental discovery requests made in this case, the defense has requested all evidence, including reports, dash camera video, and body camera video from August 17, 2023 relating to this investigation.

Pursuant to WPD Policy 3.22 for body worn cameras: "It is the policy of Wickliffe Police Department that officers shall activate the body worn cameras when such use is appropriate to the proper performance of his or her official duties..." *Id*. at p. 1. Pursuant to subsection B(5) "If an officer fails to activate the body worn cameras when its use would have been appropriate, fails to record the entire contact, or interrupts the recording, the officer shall document why a recording was not made, was interrupted, or was terminated." *Id*. at p. 2. Many of the Officers that responded to the scene on August 17, 2023, including Officers that performed interviews with possible witnesses and/or were acting in the capacity or performance of their official duties did not activate their body worn cameras. The defense has not been provided with any documentation as to why

these officers did not use and activate their department issued wearable cameras i.e. body cameras on August 17, 2023.

In addition, Defendant Daniel Kovacic alleges that law enforcement has continuously and intentionally failed to disclose all relevant reports/videos reports regarding the August 17, 2023 incident and has further tampered with evidence/reports regarding the August 17, 2023 incident.

Due process and the interests of fundamental fairness "require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). To safeguard this right, the Supreme Court has established "what might loosely be called the area of constitutionally guaranteed access to evidence," which compasses the Government's obligations relating to disclosure and production of certain evidence. *Id.* (quoting *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)). Daniel Kovacic's rights have been significantly impacted, to the point where dismissal should be the appropriate remedy in this case.

Given the totality of the misconduct of law enforcement on August 17, 2023, described above and incorporated herein by reference, as well as law enforcement failing to perform their duties as required by departmental policy, the resulting prejudice has undermined Daniel Kovacic's due process rights and constitutional rights to a fair trial, warranting dismissal of the Indictment against him.

## VI.    CONCLUSION.

Based upon the foregoing, Daniel Kovacic respectfully requests this Honorable Court to suppress all evidence obtained and statements made as a result of the illegal search and seizure that occurred at 1548 Ridgewick Dr. on August 17, 2023. The affidavit contained numerous false statements and/or material omissions. There were no remaining articulable facts contained within

the affidavit that would have established probable cause to search the premises. Daniel Kovacic respectfully requests this Honorable Court to grant his Motion to Suppress, or in the alternative, grant an evidentiary hearing and/or a *Franks* hearing so the parties can present additional testimony, evidence, and argument in support of this Motion.

Based upon the foregoing, Daniel Kovacic also separately respectfully requests this Honorable Court to dismiss the Indictment against in the interest of justice.

Respectfully Submitted,

s/ Marisa L. Serrat
**Marisa L. Serrat (#0088840)**
Attorney for the Defendant
55 Public Square
2100 Illuminating Building
Cleveland, OH 44113
(216) 696-2150; (216) 696-1718- F
Mserratlaw@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2024, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

s/ Marisa L. Serrat_____
**Marisa L. Serrat (#0088840)**
Attorney for the Defendant