# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO.1:23CR535** |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **DANIEL KOVACIC** | ) | **OPINION AND ORDER** |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## CHRISTOPHER A. BOYKO, J.:

This matter is before the Court on Defendant Daniel Kovacic's Motion to Suppress Search of Wickliffe Residence, Motion to Dismiss. (ECF # 43). For the following reasons, the Court denies the Motion.

### Background Facts

On September 27, 2023, Defendant had his Initial Appearance/Arraignment before the Magistrate Judge on a one-count Indictment for violation of Title 18 of the United States Code Sections 922(g)(1) and 924(a)(8), Felon in Possession of a Firearm. At that time, the United States moved for detention. The Magistrate Judge ordered Defendant remanded until a detention hearing which was set for October 4, 2023.

At the October 4, 2023 hearing, the United States informed the Court that on August 17, 2023, police responded to neighbors reporting gunshots at the apartment complex where

Defendant resided.  Upon arrival, the police questioned neighbors who reported the shots came from Defendant's apartment.  Another neighbor reported that a few weeks earlier, Defendant pointed a gun at the neighbor.  The police evacuated the nearby apartments and  attempted to contact Defendant through text, phone and a PA system but he did not respond.[1] Eventually, Defendant's girlfriend, Kelly Siebert, came out of the apartment.  She said Defendant was asleep but may have been drinking and she reported seeing a gun in the apartment previously.  Eventually, they were able to contact Defendant and took him into custody.

On September 20, 2023, Defendant was named in a one-count Indictment in the Northern District of Ohio.  The Indictment alleges that on August 17, 2023, Defendant possessed a firearm and ammunition in violation of 18 U.S.C. 922(g)(1) and 924(a)(8).  Defendant was taken into custody on September 27, 2023 and has remained in detention since that date.

## STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.   "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is said to exist when there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Lattner,* 385 F.3d 947,

---

[1]  A CAD entry however, reflects that the PA system was not working at the time of the incident.

951 (6th Cir. 2004), cert. denied, 543 U.S. 1095 (2005) (citations omitted).

In *Illinois v. Gates*, the Supreme Court announced the basic standard for determining whether an affidavit establishes probable cause to issue a search warrant: "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], ... there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." 462 U.S. 213, 238-39 (1983) (citations omitted) (emphasis added); see also *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003); *United States v. Davidson,* 936 F.2d 856, 859 (6th Cir. 1991).

A probable cause finding "should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236. However, reviewing courts must ensure that the issuing magistrate or judicial officer did "not serve merely as a rubber stamp for the police." *United States v. Leon,* 468 U.S. 897, 914 (1984) (quoting Aguilar v. Texas, 378 U.S. 108, 111 (1964)). Further, reviewing courts "will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.' " *Id.* at 915 (quoting *Gates*, 462 U.S. at 239). A reviewing court assesses probable cause by focusing only on the four corners of the affidavit. *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1998) (citing *Whitley v. Warden*, 401 U.S. 560, 564-65 (1971)); *United States v. Hatcher*, 473 F.2d 321, 323 (6th Cir. 1973) ("In determining that sufficiency [of the affidavit] we are concerned only with statements of fact contained in the affidavit"). "The affidavit should be reviewed in a commonsense—rather than a hypertechnical–manner, and the court should consider whether the

totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny." *United States v. Trujillo,* 376 F.3d 593, 602 (6th Cir. 2004).

### *Franks* hearing

The Fourth Amendment requires a hearing to challenge the truthfulness of the factual statements made in an affidavit supporting a search warrant "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and if "the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware,* 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).  "A defendant challenging the validity of a search warrant's affidavit bears a heavy burden."  *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).  To be entitled to a *Franks* hearing, he must "1) make[ ] a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and 2) prove[ ] that the false statement or material omission is necessary to the probable cause finding in the affidavit." *Bateman,* 945 F.3d at 1008 quoting *United States v. Pirosko,* 787 F.3d 358, 369 (6th Cir. 2015).

 A law enforcement officer's statement is only considered to be issued with "reckless disregard for the truth" if a defendant shows that the affiant subjectively "entertain[ed] serious doubts as to the truth of his [or her] allegations."  *United States v. Cican,* 63 F. App'x 832, 836 (6th Cir.  2003 quoting *United States v. Whitley,* 249 F.3d 614, 621 (7th Cir. 2001). "Allegations of [an agent's] negligence or innocent mistake are insufficient." *Franks,* 438 U.S. at 171, 98 S.Ct. 2674.  "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable

cause, no hearing is required." *Franks,* 438 U.S. at 171–72, 98 S.Ct. 2674.


**Defendant's Motion to Suppress**

According to Defendant, on Thursday August 17, 2023, between 4:05 and 4:10 pm several 911 calls were made to the City of Wickliffe, Ohio that gunshots were heard on or about the 1500 block of Ridgewick.  By 4:15 pm police had formed a perimeter around 1548 Ridgewick but did not enter the residence, knock on the door or even approach the residence that day.

At 5:05 pm a female, KS, was observed leaving 1548 Ridgewick and was taken into custody.  KS was in the residence with Defendant but left for an appointment and was unaware of the police presence until she exited the residence.  KS told police she had arrived at the residence at 4:00 pm and that Defendant was asleep.  Before leaving, she left Defendant a note that she would return shortly after 8:00 pm.  KS further told police she did not hear any gunfire and did not see Defendant with a firearm on that day or any other day.

Even though police knew KS had reported Defendant was sleeping, they did not inform the Western Lake County Emergency Response Team ("ERT"), Crisis Negotiation Team ('CRT"), Defendant's family or the media.  Instead, officers falsely represented that Defendant was barricaded in his residence and he was engaged in a standoff with police.  The officers attempted to call and text Defendant's phone despite knowing he was asleep.  The only movement in the residence was that of a dog.  In short, there was no evidence of a standoff between Defendant and police on August 17, 2023.

After several hours on the scene, officers approached the residence and at 9:02 pm,

Defendant, alerted to their presence, voluntarily surrendered and was taken into custody. Officers then obtained a search warrant for the residence.

According to Defendant, Detective James Coolick was called around the time officers contacted the ERT and CNT to assist with a barricaded male, approximately 4:45 pm.  Coolick obtained an arrest warrant for Defendant and it was in the execution of that warrant that officers alerted Defendant to their presence around the residence.   Later that same evening, Coolick acted as the affiant to a search warrant presented to a Willoughby Municipal Court Judge, Marisa Cornachio.

Defendant argues that of all the calls made to 911 regarding gunshots being fired on August 17, 2023, only one caller claimed to have witnessed someone shooting a gun.  That caller could not identify the shooter nor did they recount that the shooter came from 1548 Ridgewick. Only one person, KS, confirmed to law enforcement that she saw Defendant that day prior to his surrender to police.  KS told law enforcement she did not see Defendant with a gun or shoot a gun on August 17, 2023.

Defendant argues that Coolick's affidavit in support of the search warrant contained a number of false statements.  If the false statements are disregarded, Defendant contends there was insufficient basis to issue the search warrant and all evidence collected from the residence should be suppressed and should result in dismissal of the Indictment.  Moreover, Defendant asks the Court to hold a *Franks* hearing in order to allow Defendant to present evidence that the affidavit in support of the search warrant contained numerous false statements.  The Court will address each of these in order with the challenged affidavit statement in bold followed by the Defendant's and Government's arguments for and against, followed by the Court's ruling.

## LAW AND ANALYSIS

*I)  On August, 17th 2023, numerous emergency calls were received by the Wickliffe Police Department reporting gunshots being fired in the area of the 1500 block of Ridgewick Dr.*

Defendant argues that the determination that it was Defendant that shot a gun on August 17, 2023, was not made based on any investigation on the scene but was instead based solely on the 911 calls; none of which identified Defendant as the shooter.  Written statements from the 911 callers all failed to identify either Defendant as the shooter or the residence from which the shots came.   Defendant alleges the original 911 calls and subsequent witness statements contradict the facts as outlined in Coolick's affidavit.

Among the contradictory statements are statements from two individuals who were working on a car at 1557 Ridgewick.  At 4:12 pm the officer asked the individuals if they heard any popping sounds.  One stated it sounded more like fireworks.  They also told the officer they were outside the entire time and did not see anything despite having a view of 1548 Ridgewick.  Another neighbor reported the time of the popping sounds as half an hour to an hour prior to 4:12 pm.  Officers at the scene discussed the possibility that the sounds heard by the callers could have been from construction because around 4:50 pm an officer reported hearing two bangs from the north, possibly from equipment.

According to the Government, Defendant is not entitled to a *Franks* hearing because he cannot show any statements in Coolick's affidavit in support of a search warrant were deliberately or recklessly false, nor can he show that in the absence of any purported false statements the court lacked probable cause to order the search warrant.  Moreover, no statements

in Coolick's affidavit were false, or contained only slight differences from the information obtained from witnesses or callers.

The uncontested evidence demonstrates there were a total of nine 911 calls on August 17, 2023, reporting gunshots in the 1500-1600 block of Ridgewick.  One caller, PS, reported that it came from 1548 Ridgewick and that it was a white male in his mid 30's who drove a white Cadillac.  The caller told dispatchers he did not see the actual shooting but heard it and went over to a neighbor who did witness the shooting and said it came from 1548 Ridgewick.  The caller lived two doors down from Defendant.  A caller reported that Defendant drives a white Cadillac and had been acting strange the past few weeks.  KM, a next door neighbor of Defendant, called 911 to report hearing gunshots that she believed came from next door, 1548 Ridgewick, and that the man in that home drove a white Cadillac.  She further reported she heard him come out of his house and she heard gunshots.  She then told the dispatcher the neighbor was still there at the residence.

MW called 911 and reported he witnessed a man come out of 1548 and fire a gun into the air three times.  In his witness statement of August 17, 2023, MW reported he witnessed the man come out of 1548 Ridgewick, point a gun in the air, fire a couple of shots and then go back inside 1548.

***Court ruling***:   The transcripts from nine calls made to 911 (ECF # 49-1 PgID#s 358-369) demonstrate that multiple callers reported hearing gunshots coming from the 1500 block of Ridgewick.  Coolicks affidavit in the above challenged sentence does not report that the callers identified Defendant as the shooter. Thus, Coolick's affidavit accurately reflects the fact that multiple callers reported hearing gunshots from the 1500 Block of Ridgewick and does not

8

support a *Franks* hearing nor does it warrant suppression of the evidence obtained as a result of the search of Defendant's residence.

**II)  On arrival to the area by patrol officers, a witness PS reported that the male had fired a gun in front of 1548 Ridgewick Dr.  And then went back inside the residence closing the door behind him.**

Defendant further disputes the representation of PS's witness statement in Coolick's affidavit.  According to Coolick, PS reported that a male fired a gun in front of 1548 Ridgewick and then went back inside the residence.  This representation is false, according to Defendant, because Defendant's investigator spoke with PS.  PS told Defendant's investigator that he did not personally witness anything and did not report to an officer that he saw someone shooting a gun.  Nor did PS make a statement to police after August 17, 2023.  PS's residence was next door to Defendant's.  PS was familiar with Defendant yet, never told officers that Defendant was the male who fired a gun.  Thus, the entire affidavit's representation that PS witnessed the shooting was false.

Although Defendant challenges the affidavit's representation of PS's call in the affidavit, the Government argues there was no misrepresentation as the affidavit merely says PS "reported" not  PS "witnessed," the events he reported.  And probable cause may be supported by hearsay included in an affidavit.  Even if it were false, Defendant has not shown it was done with the requisite recklessness or intention.  Nor can he show that the excision of any alleged false portion of this caller's statements would not have resulted in there still being probable cause.

**Court ruling**:  Coolick's representation accurately reflects the contents of PS's 911 call.  PS's 911 call transcript reveals PS told the dispatcher "Um yes,um I live on Ridgewick Drive and

some guy just came out of the condo at 1548 and shot a gun off 3 times." (ECF # 49-6 Pg ID# 363). In his 911 call, PS admitted he had not witnessed the shooting but heard the shots and went over to talk to a neighbor who reported to PS what he had witnessed and PS relayed that information to the dispatcher. Thus, Coolick's representation that a caller "reported" Defendant shooting a gun in the air was an accurate portrayal of PS's call.

However, the affidavit does describe PS as a witness even though his 911 call makes clear PS did not personally observe Defendant shoot a gun into the air. Black's Law Dictionary defines a "witness" as "Someone who sees, knows, or vouches for something." Black's Law Dictionary (12th ed. 2024). Here, PS reported both what he himself heard -i.e.-the gunshots- and what his neighbor observed. Moreover, PS's statements were corroborated by Coolick when MW called and told dispatch he was the person who witnessed a man come out of 1548 and shoot a gun in the air three times. Therefore, the Court finds Coolick's affidavit statement was not a deliberate or reckless false statement warranting a *Franks* hearing or suppression of evidence gathered from the search of Defendant's residence.

**III)** ***Wickliffe Police Dispatch received a phone call from the residence (sic) of 1570 Ridgewick who stated he had witnessed the male from 1548 shoot several bullets from a gun and then walk back into his residence.***

According to Defendant, Coolick's affidavit further misrepresents the contents of the 911 call from the resident at 1570 Ridgewick. That caller, MW, stated that " a fellow across the way came out of another condo and fired off a gun three times into the air." Contrary to Coolick's affidavit, MW never stated the gunman "walked back into the residence" nor did he make any representation that the gunman was a resident of 1548 Ridgewick. In fact, he never identified

10

Defendant as the gunman.

The Government asserts that Defendant's challenge of MW's call fails to include the full content of his call wherein the dispatcher asked what condo the shooter came out of and MW replied "uh 1548." Moreover, it ignores the witness statement MW signed on August 17 wherein MW does in fact report he saw a male fire a gun in the air and then walk back into 1548 Ridgewick. While the Government admits MW's phone call to 911 did not report that the gunman walked back into his residence after discharging the weapon, MW's witness statement from that same day did contain the statement. Moreover, PS's call, quoting another witness, did report the shooter went back inside 1548. Thus, any mistake in identifying where the information came from does not support a *Franks* hearing as there was at least one caller and MW's subsequent witness statement confirming that Defendant shot the gun and went back inside 1548 Ridgewick.

While Defendant rightfully contends that MW did not identify Defendant and such information was omitted from the affidavit, such omission was not intended to deceive. The affidavit accurately portrayed MW's call information coupled with his signed witness statement.

**Court ruling:** The Court agrees with the Government that any misstatement found in Coolick's affidavit goes to the source of the evidence and not the evidence itself. Between his 911 call and signed witness statement, MW reported that he witnessed a male come out of 1548, shoot a gun in the air and walk back into the condo. Thus, any alleged false statement was not material to the facts establishing probable cause to search 1548.

**IV)** *Affiant met with this resident, MW, who stated that he had observed a white car park in front of 1548 Ridgewick and a blonde female exited and knocked on the door to 1548 before*

11

***being let in by a white male. The same white male later exited the residence and fired a gun in the air with a handgun, shooting three bullets before turning around and walking back inside, closing the door behind him. Michael completed a written statement.***

Defendant hired an investigator who interviewed MW. According to the investigator, MW did not recall seeing a visitor enter 1548 Ridgewick on August 17, 2023, or seeing anyone in the visitor parking area before or after the incident. Moreover, the 911 callers all reported hearing gunshots from somewhere between 3:30 pm to 4:00 pm. KS arrived at Defendant's residence around 4:00 pm. According to KS, Defendant unlocked the door and she walked in, therefore, Defendant was not visible to anyone outside the residence, contrary to what Coolick's affidavit states.

Defendant also contends that the affidavit falsely alleges that MW completed a witness statement when in fact Coolick prepared the statement and MW signed it without reviewing it. Defendant argues that Coolick failed to record MW's witness statement in violation of Wickliffe Police Policy. Lastly, Defendant argues Coolick intentionally omitted the fact that MW was not familiar with Defendant.

The Government asserts that the statements made to Coolick by MW at the time of the incident are accurately recounted in the witness statement. Importantly, MW does not argue that the information was false, but only now states he does not recall a visitor. However, probable cause is dependent on the information known by investigators at the time the determination is made. In addition, there was no intent to omit that MW was not familiar with Defendant as MW admittedly did not identify Defendant. Thus, there was no material omission because MW never identified Defendant and Coolick made no representation to the contrary.

**Court ruling**:  The Court agrees with the Government that MW signed his witness statement and does not contest the truth of any of the information contained therein.  At best, MW's later statement to Defendant's investigator, which is undated, merely states he does not recall seeing a blonde woman park her car.  Thus, Coolick's affidavit accurately reflects MW's statement.  MW's witness statement is dated August 17, 2023, the date of the incident and reads, "I was sitting front of my condo-unit 157-I saw a white smaller car pull up and park across the parking lot.  The driver a young blond woman went up to 1548.  She eventually was let in by a man.  Shortly after that the man came out and I heard probably a couple of loud gunshots.  I looked up and the man had a gun pointed in the air (up at the sky).  When he was done shooting he went back into the condo.  A little later I saw the man closing the blinds on the window and adjusting the window."  (ECF # 49-10 PgID# 370).   Coolick's affidavit accurately summarizes MW's signed witness statement.  Nor was there any material omission as MW never identified Defendant as the shooter and Coolick did not make such representation in his affidavit and Coolick's affidavit does not attempt to mislead the Judge that MW identified Defendant as the shooter.  Therefore, the Court finds Coolick's affidavit regarding MW's statement does not contain any deliberate or reckless false statements and does not warrant a *Franks* hearing nor suppression.

*V)  Patrol officers later detained the blonde female leaving the residence, identified as KS, Det. Fitch interviewed KS who stated that she was at the residence with her boyfriend, Defendant, who was the only other person there.  She further stated that no one else entered or exited the residence other than Defendant.  KS confirmed that she has seen Defendant with a handgun in the recent past and that he keeps it concealed in a couch.*

Defendant challenges the representation in Coolick's affidavit that KS told officers she had previously seen a gun in Defendant's residence and that he kept it in the couch.  In fact, KS told officers she never saw Defendant with a gun.  KS had only known Defendant for approximately three weeks.  She informed officers that once she arrived at the residence on August 17, 2023, Defendant never left it.  Moreover, she was unaware that officers had set up a perimeter around the residence, supporting Defendant's representation that he had no idea officers were outside his home for hours before being taken into custody.

The Government points the Court to  Ex 4, which demonstrates that officers questioned KS asking, "how many guns have you seen him to possess?"  She replied, " I, uh, that would be the only thing that was in the couch.  That was the, that was it."  Thus, even if the affidavit misstated that KS saw Defendant with a gun, she confirmed he had a gun in the past and kept it in the couch which is where officers found a gun when they searched his residence.

**Court ruling.**  The Court finds the challenged affidavit statement is not false.   KS stated in a interview with officers that she had seen a gun in Defendant's couch cushion when she was doing some cleaning.   Possession of a firearm may be actual or constructive. "[C]onstructive possession may be proven if the defendant merely had "dominion over the premises where the firearm is located." *United States v. Gardner,* 488 F.3d 700, 713 (6th Cir.2007).  "Actual possession requires that the defendant have "immediate possession or control" of the firearm." *United States v. Grubbs,* 506 F.3d 434, 439 (6th Cir. 2007).  Here, KS told officers she had seen a gun in Defendant's residence in the couch.  Coolick's affidavit accurately reflects that representation.

*VI) Affiant applied for and received a warrant for the arrest of Defendant for Having a*

*Weapon While Under Disability.  While obtaining the warrant, Defendant exited the residence and surrendered to patrol and ERT officers.*

Defendant further contends that Coolick's affidavit in support of the arrest warrant contained further false statements that several residents witnessed a white male shooting a gun in the air in front of 1548 Ridgewick and that MW observed a male hold his hand in the air and fired several shots into the air and then walked back into 1548.  In actuality, Defendant contends only one caller witnessed the shooting, not several.

Not only was there only one witness to the shooting, but the affidavit distorted the substance of the lone witness testimony.  In his statement, MW never did identify the shooter as Defendant, nor did he identify him as the resident of 1548 Ridgewick.  Contrary to the affidavit, Defendant did not surrender to officers on August 17, 2023, because the evidence shows he had no knowledge that officers were in the vicinity.  Instead, Defendant was taken into custody upon initial contact with officers.

Moreover, the affidavit used loaded terms like "barricaded," "standoff," "refused" an "surrendered" to support a false narrative that Defendant created a dangerous situation with police when in fact, he was sleeping and never knew officers were outside his home until hours later.

Nor did the arrest warrant include the statement that KS saw Defendant with a handgun in the recent past.  Only the later search warrant included this statement.  Because both the arrest and search warrants contain false statements resulting in a lack of probable cause, this warrants dismissal of the charges against Defendant.

The Government disputes Defendant's representation that the search warrant affidavit

contains a number of false statements concerning Defendant's arrest warrant.  According to Defendant, he never surrendered to police because he did not even know they were outside his house.  However, the Government argues this is semantics as he was ordered to come out of the residence and complied.  Thus, there was no false statement in the affidavit.  Moreover, Defendant has not moved to suppress the arrest warrant, so any allegedly false statements contained therein are not relevant to the motion at hand.

**Court ruling:** The Court finds the statement that Defendant surrendered to police is not a false statement as Defendant himself represents that as soon as he was aware of the police presence outside his residence he came out and was placed into custody without incident.  Thus, the term "surrendered" in Coolick's affidavit is not a loaded term indicative of a non existent standoff but merely describes Defendant's non-resistance to being placed in custody.

The Court further finds the arrest warrant is not at issue and there is no motion to suppress the arrest warrant thus, any purportedly false statements contained therein are not relevant to the issue of alleged false statements contained in the affidavit in support of the search warrant.

***VII) Affiant spoke with a neighbor located at 1546 Ridgewick who stated that she heard loud music coming from 1548 prior to this incident which is not uncommon.  She then heard several gunshots coming from what sounded like the residence of 1548 and then the music was turned off and never turned back on.***

Defendant further challenges the affidavit's representation of the statements of caller KM.  In his affidavit, Coolick wrote that the neighbor located at 1546 Ridgewick reported hearing loud music coming from 1548 Ridgewick.  She then heard gunshots from what sounded like 1548 and

16

the music was then turned off and not turned back on.

Defendant contends KM's actual 911 call never mentioned hearing loud music coming from 1548 Ridgewick on August 17.  Instead, she reported hearing nothing until the gunshots went off.  "Yeah, I didn't hear any commotion or anything, I just [unintelligible], I didn't hear any commotion."  (ECF # 49-7, PgID# 366).  Neither did KM see anyone shoot a gun.  However, the Government contends Defendant ignores a police report wherein KM reported the above.  However, even if the statement that loud music was heard was not true, it does not detract from the key portion of KM's statement that she heard gunshots from next door.

**Court ruling:**  Coolick's affidavit states he spoke with KM, thus, his affidavit was not based on the information reported by KM in her 911 call.  Instead, Coolick's affidavit recounts his conversation with KM as reflected in his police report.  However, Defendant points out that KM was interviewed by officers two days after the search warrant was obtained and executed.  Therefore, even if the Court were to hold that statement was false, it is undisputed that KM reported she heard gunshots from her neighbor's house at 1548.  Nor does Defendant's investigator's affidavit say KM never talked with Coolick, nor does she dispute in the Investigator's affidavit that she heard loud music coming from the residence.  (ECF # 43-7, PgID#305).  Thus, there is no evidence that Coolick's statements concerning KM hearing loud music were false and even if they were, they would not support suppression or a Franks hearing as KM's call regarding hearing gunshots from 1548 are unchallenged.

*VIII) Ptl.  Blair located one shell casing in the grassy area directly in front of 1548 Ridgewick Dr.*

According to Defendant no shell casings were found in front of 1548 Ridgewick.  Instead,

the evidence shows two shell casings were recovered in front of 1550 Ridgewick, yet Coolick's affidavit falsely represents a casing was found directly in front of 1548.

The Government argues that the affidavit statement that a shell casing was found in front of 1548 is not false.  The photograph found at Government's Ex.  5 (ECF # 49-11, PgID# 371), shows a casing on the grass next to the walkway leading to 1548 and 1550 Ridgewick with both residences sharing the same walkway.  Thus, it was only a matter of inches as demonstrated in Ex. 5 and not a false statement.

**Court ruling:**   Coolick's affidavit that a shell casing was found directly in front of 1548 Ridgewick is false as the photograph clearly demonstrates the case lies on the grass in front of 1550.  However, the two residences share the same walkway and the front doors to 1550 and 1548 are only a foot or so apart.  Given that 911 callers KM and MW reported the gunshots came from 1548, and MW witnessed Defendant come out of 1548 shoot and go back in to 1548, the location of the casing on the 1550 side of the common walkway and not on the 1548 side of the walkway does not support a finding that the statement was deliberately or recklessly false and would not defeat probable cause if removed from the affidavit.

*IX) Det Cook and Firth attempted to speak with Defendant after his arrest but he refused to make any statements regarding the incident.*

According to Defendant, contrary to Coolick's affidavit which stated that Defendant refused to make any statements about the incident, Defendant did speak with officers outside his residence after he was taken into custody.  Bodycam footage shows Defendant spoke with officers for approximately twelve minutes, further evidencing that the search warrant affidavit contained numerous false statements.  In fact, Det. Cook's police report states Defendant

18

"indicated he wished to speak with his attorney before speaking with officers, however, without prompting, he continued speaking out the incident."  (ECF # 43-4 Pg Id# 286).

According to the Government, Defendant did make statements after his arrest but none regarding the shooting.  Instead, Defendant invoked his right to counsel and complained of the police presence at his residence.  Any additional statements by Defendant concerned questions he posed to officers and were not responses to questions posed to him by officers.  In short, the affidavit statement accurately reflects Defendant's statements or lack thereof regarding the shooting.

**Court ruling:** A review of the transcript of Defendant's statements reveals that he did not discuss the shooting with officers after he was taken into custody.  He announced to officers he was not going to talk to them until he talked with his attorney.  He denied doing anything wrong and then questioned officers about why they did not knock on the door or otherwise try to talk to him.  He denied having a gun in his house and denied having done anything wrong, but refused to answer officers questions about the incident.  Thus, Defendant did make statements generally about the incident but refused to answer any questions from officers.  However, even if the Court were to find the affidavit representation was false, it would not warrant a *Franks* hearing nor would it require suppression of the evidence found in 1548 as it does not defeat probable cause that Defendant had fired a gun in the air and had a gun in his residence on August 17.

***X) Affiant met with the neighbor at 1550 Ridgewick, DS, who stated that two week ago, he got into an argument with Defendant about him playing his music too loud.  The argument escalated and Defendant pulled a 9mm silver pistol out, "racked the slide" and pointed the gun at DS's chest threatening him.  David completed a written statement.***

19

Defendant contends Coolick's affidavit falsely represented that DS told Coolick that two weeks prior he got into an argument with Defendant and Defendant pulled a 9mm silver pistol out, racked the slide and pointed the gun at DS's chest. In fact, in his written statement, DS never described a silver 9mm, never said Defendant racked the slide or threatened DS. Defendant argues the affidavit statement is false because the witness never described a 9mm silver pistol nor did he say that Defendant racked the slide.

The Government responds that these details were not in DS's call or statement but were recorded by Coolick in his August 18, 2023 police report wherein he recounted DS's statements. Nor does Defendant's affidavit support a finding that these statements were deliberately false. In fact, DS's witness statement supports the representation found in the affidavit.

**Court ruling**: DS's witness statement reads "he pulled a gun on me and cocked it back with a laser pointed on my chest." (ECF 3 43-10 pgID 311). There is no description of the gun in DS's statement. However, in his police report, Coolick reported that DS had described the gun as described in Coolick's affidavit. Months after filing his Motion to Suppress, Defendant filed an affidavit of his investigator who reports he interviewed DS and DS told him he was drunk when he confronted Defendant and it was dark so he did not see a gun only a laser dot. He did not see a silver gun and did not hear Defendant rack the slide. (ECF # 64-1). However, the probable cause analysis concerns events known by the affiant at the time the affidavit is created. As the Government points out, a statement in an affidavit is deemed truthful if it is "believed or appropriately accepted by the affiant as true." *Franks,* 438 U.S. at 165. An affiant's negligence or innocent mistake is insufficient to warrant a *Franks* hearing as "*Franks* recognizes that the information an affiant reports may not ultimately be accurate, and is willing to tolerate such a

result at that early stage of the process, so long as the affiant believed the accuracy of the statement at the time it was made." *United States v. Rodriguez-Suazo,* 346 F.3d 637,648 (6th Cir. 2003) (quoting *Mays v. City of Dayton,* 134 F.3d 809, 816 (6th Cir. 1998)). DS signed a statement acknowledging Defendant had previously pointed a gun at him.  Even crediting that DS did not describe the gun, the crucial information was simply the fact that Defendant had a gun and pointed it at DS.  Thus, any false portion of the statement if removed from the analysis does not effect the probable cause component that Defendant possessed a gun and a search of the residence was likely to uncover the gun in Defendant's residence.

**XI)  Finally, Defendant argues the officers failed to justify the necessity of a protective sweep and a nighttime search of Defendant's residence.**

Defendant argues officers improperly conducted a protective sweep of Defendant's residence despite the fact that officers did not collect any evidence against Defendant in the sweep.  Officers failed to articulate any reasonable basis for the sweep.  Defendant did not consent to the sweep nor was there any basis to believe the residence harbored any individual that would pose a threat to the officers' safety.

Defendant also contends the affidavit failed to provide sufficient grounds for a nighttime search.  Any need for a nighttime search was due solely to the officers unreasonable delay in contacting Defendant.

The Government responds that a protective sweep was needed given Defendant's erratic behavior, firing a gun in the air, threats against non-whites and officers' belief Defendant was using drugs.  Even if the protective sweep were not warranted, the Government argues it does not warrant suppression of evidence as no evidence was collected from the protective sweep nor was

anything discovered in the house from the protective sweep that provided a basis for support of the search warrant.

The Government further contends the nighttime search was warranted as Defendant had already been arrested and removed from the premises and it alleviated the need to maintain police security of the premises for nine hours until a day time search could be conducted. Because no federal agents were involved in the search, Fed. Crim. Rule 41(a) does not apply and under Ohio law there is no exclusion of evidence for failure to strictly comply with O.R.C. § 2933.24(A) of Criminal Rule 41(C).

**Court ruling:**  Regarding the protective sweep, the United States Supreme Court has held, the police may conduct a protective sweep if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *United States v. Holland,* 522 F. App'x 265, 275–76 (6th Cir. 2013) quoting *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).  Here, there is no dispute Defendant did not provide consent to search his apartment.  The Government argues that a sweep was necessary because officers knew Defendant was acting erratically, had fired a gun in the air multiple times outside his residence, had threatened to kill enemies of the white race and was possibly on drugs. Despite KS's representation that Defendant was alone, the Government claims officers had reason to doubt her truthfulness.  However, the Sixth Circuit has held that "where a defendant is arrested outside a home, 'a warrantless search of the apartment could be justified only if the officers had a specific, reasonable basis for believing ... that they were in danger from persons inside....'"  *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996) quoting *United States v*

22

*Calhoun,* 49 F.3d 231, 234 n. 3 (6th Cir.1995).  Defendant was arrested outside his residence and the Government has failed to articulate specific facts that demonstrate a reasonable basis to believe there was someone in the house that posed a danger to officers.  However, there was no evidence seized in the protective sweep nor was anything discovered in the sweep that was used or cited to in the affidavit in support of a search warrant.  Thus, there is no basis to suppress any evidence found as a result of the lawful search warrant.

The nighttime search was authorized by the judge whose search warrant included the language "[t]herefore, you are hereby commanded to search the above named residence, in the daytime or the nighttime..."  Ohio Criminal Rule 41 reads,  "the warrant shall be executed in the daytime, unless the issuing court, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime."  Similarly, Ohio Revised Code § 2933.24 reads, "The command of the warrant shall be that the search be made in the daytime, unless there is urgent necessity for a search in the night, in which case a search in the night may be ordered."

Here, officers requested a nighttime search as Defendant was already arrested, there was no one else residing in the house and it would alleviate the need to post officers at the house overnight to secure the location.  The Court finds the nighttime search was reasonable in light of the circumstances and did not violate Defendant's constitutional rights and did not violate Ohio law.   Moreover, because no federal officers were involved in the search, Fed.  Crim R.  41(a) does not apply.  "When federal officers are not involved in obtaining or executing a challenged search warrant, Rule 41(a) does not apply."  *United States v. Marales,* 10 F. App'x 268, 269 (6th Cir. 2001).

In conclusion, the affidavit in support of a search warrant provided sufficient probable cause to authorize a search warrant.  At a minimum, the officers had undisputed evidence from witness MW that he saw a man come out of 1548 and fire gunshots in the air and return to 1548.  KS reported no one was in the house but her and Defendant at the time of the shooting.  Neighbor KM heard someone come out of 1548 and fire a gun.  And, DS provided a witness statement that two weeks prior to the incident, Defendant pointed a gun at him.   These facts, known to officers at the time of they sought a search warrant, are more than sufficient probable cause to support the issuance of a search warrant and deny a *Franks* hearing.  "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."  *Franks*, 438 U.S. at 171–72, 98 S.Ct. 2674.  Therefore, the Court denies Defendant's Motion to Suppress and request for a *Franks* hearing.

**Motion to Dismiss**

According to Defendant, Wickliffe Police violated their own Body Worn Camera Policy 3.22 when investigating the events of August 17, 2023.  Because such violations were particularly egregious, it constitutes outrageous government conduct that mandates dismissal of the Indictment.

Only a limited number of interviews and interactions with witnesses in the search warrant affidavit were captured on body camera, and did not include the protective sweep nor the execution of the search warrant.  Virtually none of the four hours in which KS was detained and questioned was captured on the body cameras.  Neither were any of the interviews of Defendant's family members captured on camera.  As all these failures were in contravention of Wickliffe

24

Police Policy, these failures have prevented Defendant from demonstrating the representations in the search warrant affidavit and police reports were false.

As a result of these failures, important evidence was not obtained, not documented and/or was not properly preserved, prejudicing Defendant's defense.

WPD Policy 3.22 reads, "It is the policy of the Wickliffe Police Department that officers shall activate the body worn cameras when such use is appropriate to the proper performance of his or her official duties." At subsection B(5) it further reads, "If an officer fails to activate the body worn cameras when its use would have been appropriate, fails to record the entire contact, or interrupts the recording, the officer shall document why a recording was not made, was interrupted, or was terminated." Because much of the officers' interactions were not captured on the body cameras, Defendant's ability to defend the case is severely compromised and dismissal is appropriate.

The Government responds that approximately thirty-three officers responded to the incident in question from six different police departments during the nine hours they were onsite. There were fourteen police officers from Wickliffe and the remaining officers were from the ERT and those officers do not wear body cameras. Seventeen body camera videos were provided to Defendant and concerned the movements of officers on the scene and the interview with KS.

It is Defendant's burden to prove that lost or destroyed evidence is both material and exculpatory. However, there is no due process violation if the evidence at issue is merely potentially exculpatory unless it was lost or destroyed in bad faith. Moreover, mere negligence will not meet the standard nor does a violation of a department policy provide a basis for

25

suppression or dismissal.

The Government argues that it has timely responded to multiple discovery requests without complaint by Defendant. There has been no motion to compel filed in this action nor has there been any allegation that the Government tampered with evidence prior to this Motion. Finally, any violation of an internal policy does not provide a legal nor constitutional basis for suppression or dismissal.

"The Supreme Court has recognized that the Due Process Clause of the Fifth Amendment may require reversal of a criminal conviction where the governmental action involved "shocks the conscience" and offends "canons of decency and fairness." *Rochin v. California,* 342 U.S. 165, 169, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). "Similarly, the Supreme Court has indicated in dicta that outrageous government conduct outside the grand jury process can result in dismissal on due process grounds if such conduct is so outrageous that it violates "fundamental fairness" or is "shocking to the universal sense of justice." *United States v. Napier*, 787 F.3d 333, 341 (6th Cir. 2015) *citing United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). "[A] violation by the government of its internal operating procedures, on its own, does not create a basis for suppressing [statements]." *United States v. Luck*, 852 F.3d 615, 623–24 (6th Cir. 2017) *United States v. Myers,* 123 F.3d 350, 355–56 (6th Cir. 1997). ("In other words, that the Department of Justice happened to conclude, in its professional judgment, that it was wise policy to encourage recording of interviews does not mean the new technique is now required in order to comport with due process.")

The Court agrees with the Government that any violation of the Wickliffe Police Department Body Camera Policy does not equate to a due process violation nor does it constitute

outrageous government conduct that would warrant suppression or dismissal.  Moreover, there is no evidence that body camera footage was deleted or tampered with.  At best, Defendant can show that cameras were not turned on during witness interviews but Defendant was free to interview these witnesses in order to disprove the Wickliffe officer's representations of the witness statements.   Thus, the Court does not find that Defendant's case was prejudiced such that it would warrant dismissal.

Therefore, the Court denies Defendant's Motion to Dismiss the Indictment.

IT IS SO ORDERED.


Date: 03/24/25                          /S/ Christopher A. Boyko
                                        CHRISTOPHER A. BOYKO
                                        United States District Judge